**In re JKJ CHEVROLET,
INC., et al., Debtors.**

**Bankruptcy No. 91–14535.**

United States Bankruptcy Court,
E.D. Virginia,
Alexandria Division.

Dec. 12, 1995.

John B. Connor, Verner, Liipfert, Bernhard, McPherson and Hand, Chartered, McLean, Virginia, for debtors.

George R. Pitts, Dickstein, Shapiro & Morin, Washington, DC, for Ford Credit.

## MEMORANDUM OPINION

MARTIN V.B. BOSTETTER, Jr., Chief Judge.

On July 8, 1992, this Court entered an order authorizing the debtor, JKJ Chevrolet, Inc., to use Ford Motor Credit Corporations's ("Ford Credit") cash collateral to pay its employees for work performed prior to the sale of the debtor's business on March 10, 1992. Ford Credit appealed the July 8th order to the United States District Court for the Eastern District of Virginia. The District Court remanded the matter instructing this Court to make a finding as to whether Ford Credit received adequate protection for its security interest. For the reasons set forth below, we find that Ford Credit was adequately protected to enable the debtor to use cash collateral pursuant to section 363 of the Bankruptcy Code.

## I. FACTS.

The debtor, JKJ Chevrolet, Inc., was an automobile dealership located in Northern Virginia which was formerly controlled by John W. Koons, Jr. On October 21, 1991, the debtor filed a voluntary petition under Chapter 11 of the Bankruptcy Code. The debtor continued operating its business pursuant to §§ 1107 and 1108 of the Code. The schedules listed Ford Credit as having a secured claim in the amount of $14,541,-372.40. Ford Credit is the primary secured creditor of the debtor by virtue of various security and other agreements under which Ford Credit provided floorplan financing to the debtor for its motor vehicle inventory. Under the terms of the security agreements, Ford Credit held a first priority security interest in virtually all the debtors' assets. In order to continue operating its business, the debtor required the use of Ford Credit's cash collateral. During the course of the debtor's Chapter 11 case, Ford Credit and the debtor entered into three consent orders that authorized the debtor to use ford Credit's cash collateral, subject to certain restrictions.[1]

The consent orders were made final by order dated February 18, 1992 (the "final consent order"). The final consent order authorized the debtor to operate its business in the ordinary course, subject to the terms and conditions specified in the order. Specifically, the final consent order provided that the debtor "shall pay, but only from Available Cash Collateral, all post-petition wages, employee benefits and employer contributions to employee benefit plans when due." Final Order ¶ 14(f). Thus, payment of employee wages was explicitly authorized by order of this Court.

The final consent order granted Ford Credit relief from the stay effective March 10, 1992, the same date that this Court approved the sale of the assets of the debtor to

---

1. For a detailed discussion of the facts and background of this case, see *Ford Motor Credit Co. v. Reynolds & Reynolds Co. (In re JKJ Chevrolet,* *Inc.), 26 F.3d 481 (4th Cir.1994) and the related case of In re K & L Lakeland, Inc., 185 B.R. 20 (Bankr.E.D.Va.1995) (Bostetter, C.J.).

James E. Koons. Following the sale, Ford Credit took control of the debtor's funds, and in particular, "seized" the paychecks of the debtor's employees. On April 16, 1992, the debtor filed a motion seeking permission to use the funds seized by Ford Credit to pay its employees approximately $297,525.60 in post-petition wages, commissions, employee benefits and payroll taxes for work performed through March 10, 1992.

Ford Credit opposed the debtor's motion. Following an evidentiary hearing on June 2, 1992, this Court granted the debtor's motion and authorized the debtor to pay its employees' salaries and commissions, employee benefits and payroll taxes aggregating $209,179.51. On September 29, 1992, we denied Ford Credit's motion to alter and amend the judgment. Ford Credit appealed to the United States District Court for the Eastern District of Virginia. On September 17, 1993, the District Court remanded the matter, instructing this Court to make a finding as to whether Ford Credit was adequately protected. On February 28, 1994, Ford Credit filed a motion to reopen the record on remand. The debtor opposed the motion, and a hearing was held on April 12, 1994. Following oral argument on April 12th, we ruled from the bench that it was not necessary to reopen the record and took the matter under advisement.

## II. *DISCUSSION.*

In order to protect the interests of secured creditors, the Bankruptcy Code imposes limitations on a debtor's use of property in attempting to reorganize. Section 363 of the Code limits the debtor's ability to use "cash collateral." [2] Section 363 of the Code states in relevant part:

(2) The trustee may not use ... cash collateral ... unless—

(A) each entity that has an interest in such cash collateral consents; *or*

(B) the court, after notice and a hearing, authorizes such use ... in accordance with the provisions of this section.

11 U.S.C. § 363.

Ford Credit withdrew its consent to the debtor's use of cash collateral under the terms of the final consent order when it seized the employee's paychecks on March 10, 1992. Alternatively, Ford Credit's consent expired upon the termination of the final consent order by its own terms on March 10th. The final consent order expressly provides that "[a]ny extension of debtor's right to use cash collateral beyond [the] termination date, [i.e. March 10, 1992] without Ford Credit's consent shall be subject to (a) approval by this Court upon request by Debtor for continued use of cash collateral after notice to Ford Credit and an opportunity to be heard." Final Order at ¶ 22. Therefore, the only means by which the debtor would be allowed to use cash collateral is with this Court's authorization. Our authority to permit the use of cash collateral is governed by § 363(c) which requires a finding of adequate protection under § 363(e).[3]

At the outset, we note that we reject Ford Credit's argument that because the cash collateral order expired on March 10, 1992, the debtors could not subsequently seek authority to use funds to pay operating expenses incurred prior to March 10th, but not due until after March 10th. Moreover, as noted above, the express terms of the final consent order addressed the debtor's right to seek court authority to use cash collateral beyond the termination date. This Court is

---

2. "Cash collateral" is defined in § 363(a) of the Code as:

cash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents whenever acquired in which the estate and an entity other than the estate have an interest and includes the proceeds, products, offspring, rents, or profits of property ... subject to a security interest as provided in section 552(b) of this title, whether existing before or after the commencement of a case under this title. 11 U.S.C. § 363(a) (1994).

3. Section 363(e) of the Code provides, in pertinent part:

(e) Notwithstanding any other provision of this section, at any time, on request of an entity that has an interest in property used ... or proposed to be used ... by the trustee, the court, with or without a hearing, shall prohibit or condition such use ... as is necessary to provide adequate protection of such interest. 11 U.S.C. § 363(e).

not inclined to implement such a rigid approach to the reorganization process. Ford Credit benefitted from the work performed by the debtor's employees up to and including March 10, 1992. The happenstance of the expiration of the cash collateral order before the wages were actually paid should not preclude payment of wages due employees. *See In re Phoenix Pipe and Tube, L.P.,* 174 B.R. 688, 689–90 (E.D.Pa.1994) (secured creditor prohibited from objecting to expenses to which they expressly consented; debtor authorized to use cash collateral to pay employees for work performed through date of expiration of cash collateral order).

In our order of July 8, 1992, we authorized the debtor to use Ford Credit's cash collateral in the amount of $209,179.51 for wages, employee benefits and payroll taxes incurred through March 10, 1992. In ruling from the bench, we specifically found that there was sufficient evidence that on March 10, 1992, approximately $240,000 was available cash collateral. Further, the evidence revealed that Ford Credit benefitted from the work performed by the employees in that the business continued to operate as a going concern through March 10th, and therefore, the value of Ford Credit's all-encompassing security interest was, at the very least, maintained. Accordingly, we concluded that the debtor was authorized to use cash collateral to pay the employees who had worked to keep the business operating.

■ The question remains, however, was Ford Credit "adequately protected"? Ford Credit asserts that the evidence adduced at the June 2nd hearing indicates that a "collateral shortfall" existed as of February 22, 1992, and therefore, it was not "adequately protected." Paragraph 7(b) of the final consent order defines "collateral shortfall" as follows:

> b. If at any time the value of the Debtor's cash, cash equivalents, inventory, Eligible Accounts Receivable (defined below) and other collateral subject to Ford Credit's liens and security interest is less than the value of the same categories of collateral as of October 21, 1991 (a "Collateral Shortfall"), the Debtor's authority to use Avail-

able Cash Collateral shall immediately cease . . .

At the June 2nd trial, Ford Credit put on evidence prepared by Coopers & Lybrand that between October 22, 1991 (the petition date) and February 22, 1992, its collateral position dropped by $432,983. We decline to equate Ford Credit's definition of "collateral shortfall" with lack of "adequate protection" as required by § 363(e).

■ Adequate protection is a flexible concept that is determined by considering the facts of each case. *See In re O'Connor,* 808 F.2d 1393, 1396–97 (10th Cir.1987) (" 'adequate protection' [is] a concept which is to be decided flexibly on the proverbial 'case-by-case' basis"). While section 361 does not itself address the issue of the date of valuation of a creditor's collateral for purposes of determining whether adequate protection exists, the House Report discussion of the language of section 361 explains:

> The section does not specify how value is to be determined, nor does it specify when it is to be determined. These matters are left to case-by-case interpretation and development. It is expected that the courts will apply the concept in light of the facts of each case and general equitable principles. It is not intended that the courts will develop a hard and fast rule that will apply in every case. The time and method of valuation is not specified precisely, in order to avoid that result. . . . [F]lexibility is important to permit the courts to adapt to varying circumstances and changing modes of financing.

H.R.Rep. No. 95–595, 95th Cong., 1st Sess. 339 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6295; *see also Paccom Leasing Co. v. Deico Electronics (In re Deico Electronics, Inc.),* 139 B.R. 945, 947 (9th Cir. BAP 1992). Thus, "the protection afforded a creditor whose cash collateral is permitted by the Court to be used by a debtor in possession is whatever condition is deemed necessary to provide adequate protection of the creditor's interest." *In re Quality Beverage Co., Inc.,* 181 B.R. 887, 896 (Bankr.S.D.Tex.1995).

Section 361 of the Code provides three non-exclusive means of providing adequate

protection.[4] These alternatives include requiring the debtor to make a cash payment or periodic cash payments to the extent of a decrease in the value of the property. 11 U.S.C. § 361(1). Alternatively, the debtor may provide an additional or replacement lien to the extent of a decrease in the value of the property. 11 U.S.C. § 361(2). Lastly, adequate protection may be provided by granting other relief that will result in the indubitable equivalent of the interest in the property. 11 U.S.C. § 361(3).

As adequate protection to Ford Credit for allowing the debtor to use its cash collateral, the debtor provided all three forms of adequate protection expressly provided for under § 361. The final consent order required the debtor to make adequate protection payments, grant adequate protection liens, and imposed significant terms and conditions on the debtor's ability to use its cash collateral. Some of those terms and conditions included the following:

1. The order required the debtor to maintain a segregated bank account and deposit into the account on a daily basis all cash, checks, and cash equivalents from any source. Final Order ¶ 2.

2. The order required the debtor to remit to Ford Credit all proceeds from the sales of floorplan vehicles within 2 business days after the sale. Final Order ¶ 4.

3. The order required the debtor to maintain a second segregated bank account for all proceeds from the sale of non-floor plan vehicles. The debtor could use Ford Credit's cash collateral from this account only to the extent that the cash collateral did not exceed the debtor's profits from sales of vehicles, sales of parts and services, operation of the finance and insurance sections, and operation of the rental vehicle division (defined in the order as "Available Cash Collateral"). Final Order ¶¶ 4(d), 6.

4. Ford Credit claimed all "certificates of origin" and "certificates of title" relating to vehicles that remained on the debtor's lot after October 22, 1991. Final Order ¶ 5.

5. The order provided for a Ford Credit representative to remain on the debtor's premises to observe all sales transactions and to inspect its collateral. Additionally, the order required the debtor to keep Ford Credit informed of all business transactions occurring after normal business hours, and to make its books, records, and financial information available to Ford Credit representatives and its accountants. Final Order ¶ 9.

6. "As further adequate protection," the order granted Ford Credit a "valid first security interest in all of [the] debtor's postpetition accounts, accounts receivable ..., inventory, parts, motor vehicles of all kinds, ... rebates from manufacturers, contract rights, profits and proceeds from the sale of vehicles, parts and performance of labor ... and also any value in vehicle trade-ins and all products and proceeds thereof ..." Final Order ¶ 15.

7. Finally, the debtor was required to provide weekly collateral summaries to Ford Credit which included a statement of the debtor's cash and cash equivalents, an inventory of vehicles and parts and an aging report on all outstanding accounts receivable. Final Order ¶ 7.

■ Ford Credit correctly asserts that the ultimate burden of proof on the issue of adequate protection lies with the debtor. 11 U.S.C. § 363(*o*)(1). We find that the debtor has met its burden. The testimony at the June 2nd hearing indicated that the debtor

---

4. Section 361 of the Code provides:

When adequate protection is required under section 362, 363, or 364 of this title of an interest of an entity in property, such adequate protection may be provided by (1) requiring the trustee to make periodic cash payments to such entity, to the extent that the stay under section 362 of this title, use, sale, or lease under section 363 of this title or any grant of a lien under section 364 of this title results in a decrease in the value of such entity's interest in such property; (2) providing to such entity an additional or replacement lien to the extent that such stay, use, sale, lease, or grant results in a decrease in the value of such entity's interest in such property; or (3) granting such other relief, other than entitling such entity to compensation allowable under section 503(b)(1) of this title as an administrative expense, as will result in the realization by such entity of the indubitable equivalent of such entity's interest in such property.

11 U.S.C. § 361 (1994).

was at all times in compliance with the terms and conditions outlined above. There has been no suggestion that the debtor was uncooperative, that payments were not timely made or that the debtor failed to operate its business in a commercially reasonable manner. Moreover, a representative of Ford Credit was present at the dealership every day overseeing the debtor's business operations. It was not until after the sale of the business that Ford Credit asserted that notwithstanding that all of its requirements were in place, at some point during the course of the reorganization its collateral position fell. Ford Credit further contends that although they drafted the "adequate protection" requirements of the final consent order, the debtor is somehow now required to prove some "additional" adequate protection existed. We find Ford Credit's position disingenuous.

At the June 2nd hearing,[5] the debtor adduced sufficient evidence to show that it was complying with the conditions of the final consent order as required by Ford Credit. John Koons, III, debtor's general manager, testified that to the best of his knowledge, the debtor was complying with the terms and conditions set forth in the cash collateral orders. Tr. at 25, 27, 66. He testified that there was a representative from Ford Credit at the dealership during the entire time the cash collateral orders were in effect monitoring the day to day operations and making sure that they were in compliance with the cash collateral orders. Tr. at 25–28. Further, Mr. Koons testified that at no time before March 10th did a Ford Credit representative inform him that the debtor was not in compliance with the cash collateral orders. Tr. at 66. Harry Moore, branch manager for Ford Motor Credit, confirmed Mr. Koons' testimony that a representative from Ford Credit was present at the dealership every day monitoring the operations in accordance with the cash collateral order. Tr. at 75.

The only evidence that the debtor was not in conformity with the cash collateral orders was the testimony of Frederick Miller, an account with Coopers & Lybrand. Mr. Miller testified for Ford Credit that the

weekly financial reports required to be submitted to Ford Credit by the debtor under paragraph 9 of the final consent order were not accurate. Tr. at 84. However, Mr. Koons testified that he prepared the collateral summaries with the assistance of the debtor's comptroller and that the figures were accurate. Tr. at 63–64, 107. Thus, the only evidence that the debtor was not in compliance with the final consent order is disputed evidence that the weekly collateral summaries provided to Ford Credit were not accurate.

Additionally, the evidence as to Ford Credit's collateral position was unsubstantiated. The parties adduced conflicting evidence as to Ford Credit's collateral position during the course of the reorganization. Mr. Miller prepared a report on the financial status of the debtor which indicated a collateral shortfall in the amount of $432,983 as of February 22, 1992. Tr. at 93. Mr. Koons disagreed with Mr. Miller's conclusion because the numbers Mr. Miller used to determine the debtor's collateral position on the petition date were incorrect. Tr. at 108–09. In fact, the debtor's reports showed that there had been no collateral shortfall. Tr. at 90. Mr. Miller and Mr. Koons met to discuss the differences in their figures, and they simply could not agree. Tr. at 90–91. Neither party presented evidence as to Ford Credit's collateral position as of March 10, 1992. Consequently, the evidence as to Ford Credit's collateral position was at best unclear.

Notwithstanding the conflicting testimony as to Ford Credit's collateral position, we reject Ford Credit's contention that it was not adequately protected. The evidence indicates, and we conclude therefrom, that sufficient adequate protection existed to enable the debtor to use Ford Credit's cash collateral to pay its employees $209,179.51 for work performed through March 10, 1992. Disputed evidence of inaccurate weekly financial summaries does not amount to lack of adequate protection. Furthermore, the "potential" decline in Ford's collateral position of $432,983 as of February 22, 1992, standing alone, is insufficient to rebut the debtor's undisputed testimony that it was in all other

5. "Tr. — at ——." refers to the Transcript of the     hearing held June 2, 1992.

respects complying with Ford Credit's adequate protection requirements under the final consent order on March 10th.[6]

The situation here is not a general request to use cash collateral for ongoing business operations, but a specific request to use a specific amount of cash collateral for specific expenses incurred in the ordinary course of business. In *In re Dynaco Corporation*, 158 B.R. 552 (Bankr.D.N.H.1993), the Court allowed the debtor to use the secured creditor's cash collateral to pay employee wage claims that became due post-petition for worked performed pre-petition. As adequate protection, the Court required that the secured creditor be given a replacement lien to cover the use of cash collateral for that purpose. *Id.* at 553. In support of its holding, the *Dynaco* Court stated:

> The secured claimant has benefitted from the work performed by the employees of these debtors prior to the bankruptcy filing and therefore the secured claimant will not be heard in opposition to payment for the wages due those employees for services which benefitted and created additional collateral for the secured claimant.

*Id.* at 552; *cf. In re Phoenix Pipe and Tube, L.P.*, 174 B.R. 688, 690 (Bankr.E.D.Pa.1994) ("§ 506(c) provides that the collateral of a secured creditor may be charged for expenses which are necessary, reasonable and benefit the creditor. Included in recoverable expenses is the labor in creating collateral. Here, employee expenses were clearly necessary.").

In this case, the work performed by the debtor's employees in good faith benefitted Ford Credit to the extent that the debtor's business continued and that its going concern value was preserved. Ford Credit was receiving adequate protection payments and replacements liens. There is no evidence that these requirements were insufficient to allow the debtor to use $209,179.51 of Ford Credit's cash collateral to pay its employees. Although Ford Credit was concerned about its collateral position as early as December, 1991, they literally stood by and watched the employees work through the date of the sale of the business and now refuse to pay them just compensation. Ford Credit cannot now say that in hindsight the adequate protection payments, replacement liens and other conditions placed on the debtor did not adequately protect its interest to allow the use of its cash collateral to pay employee wages.

Accordingly, for the reasons set forth above, we find that Ford Credit was adequately protected to enable the debtor to use $209,179.51 of Ford Credit's cash collateral to pay its employees. The Court shall enter an appropriate order.

### ORDER

For the reasons set forth in the Memorandum Opinion dated the 12th day of December, 1995, and entered herein, IT IS HEREBY

ORDERED that the upon remand from the United States District Court for the Eastern District of Virginia for a finding of adequate protection, we find that Ford Motor Credit Corporation was adequately protected to enable the debtor to use $209,179.51 of Ford Credit's cash collateral to pay its employees.

---

6. Ford Credit cites *In re Glasstream Boats, Inc.*, 110 B.R. 611 (Bankr.M.D.Ga.1990), for the proposition that use of cash collateral should be denied where debtor is unable to provide reliable collateral reports. The decision in that case was entirely fact specific, and is distinguishable from this case in several respects. First, the debtor in *Glasstream* twice violated the court's orders "knowingly and intentionally" by refusing to remit funds to the secured creditor and overspending for its operating expenses. *Id.* at 612. Second, the debtor requested authority to use up to $175,000 per week of the creditor's cash collateral to carry on its business operation. *Id.* Finally, the debtor was unable to provide *any* proof of its cash and inventory figures to start from, nor could it provide those figures more often than monthly. *Id.* The extreme circumstances in *Glasstream* are not present here.