**In re Allen GOODE, Debtor.**

**Bankruptcy No. 99–20963.**

United States Bankruptcy Court, E.D. Texas, Marshall Division.

June 2, 1999.

Rodney Scott, Longview, TX, for Allen Goode.

Scott Ritcheson, Ritcheson, Dollahite & Lauffer, P.C., Tyler, TX, for Citizens National Bank.

## MEMORANDUM OF DECISION DENYING DEBTOR'S MOTION FOR AUTHORITY TO USE CASH COLLATERAL AND GRANTING MOTION TO PREVENT USE OF CASH COLLATERAL FILED BY CITIZENS NATIONAL BANK

BILL G. PARKER, Bankruptcy Judge.

This matter is before the Court on final hearing of the Motion For Authority to Use Cash Collateral (the "Debtor's Motion") filed by the Debtor, Allen Goode ("Debtor") which seeks authority to use certain cash collateral of Citizens National Bank ("CNB"). CNB objects to the use of its cash collateral and, in fact, filed a corresponding "Motion to Prevent Use of Cash Collateral" pertaining to the same cash proceeds one day prior to the filing of the Debtor's Motion. Pursuant to § 363(c)(3) of the Bankruptcy Code [1], this Court consolidated the hearings on the two motions and the Court finds that appropriate notice of the two motions and the final hearing regarding them was given according to the Federal and Local Rules of Bankruptcy Procedure. This Court has jurisdiction to consider these motions pursuant to 28 U.S.C. § 1334 and 28 U.S.C. § 157(a). The Court has the authority to enter a final order regarding this contested matter since it constitutes a core proceeding as contemplated by 28 U.S.C. § 157(b)(2)(A), (M), and (O). Based upon the Court's consideration of the pleadings, the evi-

---

1. § 363(c)(3) provides that any hearing on a debtor's request for authority to use cash collateral may be consolidated with a hearing on a creditor's motion to prohibit such use.

dence admitted at both the preliminary hearing and at the final hearing on the motions and the argument of counsel, the Court makes the following findings of fact and conclusions of law[2] pursuant to Fed. R.Civ.P. 52, as incorporated into contested matters in bankruptcy cases by Fed. R.Bankr.P. 7052 and 9014.

## I. *PROCEDURAL BACKGROUND.*

On May 5, 1999, the Debtor filed his voluntary petition for relief under Chapter 13 of the Bankruptcy Code. On May 12, 1999, CNB filed its motion to prevent use of cash collateral and requested an expedited hearing on its motion. On May 13, the Debtor filed his motion for authority to use the cash collateral and requested an emergency hearing. The Court set both motions for hearing on an emergency basis, with the Debtor having the burden of persuasion at such hearing with regard to its request to use the CNB's cash collateral. The Court conducted a preliminary hearing on May 18, 1999[3] and, upon conclusion of the preliminary hearing, set both motions for final hearing on June 1, 1999. A final hearing was conducted on both motions on that date at which the parties submitted both oral testimony and documentary evidence, including a joint stipulation of facts, and presented legal arguments. At the conclusion of the hearing, the Court took the matter under advisement so as to give the Court the opportunity to review the evidence presented.

## II. *FINDINGS OF FACT.*

The parties have stipulated for the purpose of this Court's consideration of the two corresponding motions that CNB has a valid, existing and perfected lien upon all assets of this Estate. Included among those encumbered assets is the approximate sum of $23,142.00, currently deposit-

ed in the First National Bank of Linden, which constitutes "cash collateral" under 363(a) of the Bankruptcy Code. The parties have further stipulated (per Exhibit "Q") that the Debtor owns no equity in the property securing the claims of CNB and there is no dispute between the parties that the aggregate amount owing to CNB by the Debtor is in the approximate amount of $329,000.00.

The Debtor, prior to the filing of this case, was engaged in three distinct businesses as a sole proprietorship: (1) the construction business, (2) the "per-haul" trucking business; and (3) the business of supplying livestock for rodeos. In the midst of a faltering construction business, evidenced by the Debtor's own financial reports admitted as Exhibit "O" which showed a $31,000.00 loss for the construction business in 1998, a problem undoubtedly caused in part or at least compounded by the disappearance of the Debtor's so-called "partner" in that business, the Debtor went to CNB to obtain proceeds for the precise purpose of allowing the Debtor to have funds sufficient to complete a certain construction job, which has been labeled by the parties herein as the "Renegade contract." The Debtor went to CNB for such loan, notwithstanding the fact that the Debtor already owed CNB the approximate sum of $337,000 arising from four previous loans.

To obtain the funds from CNB to complete the Renegade contract, the Debtor signed a promissory note, admitted as Exhibit "E", under which the Debtor agreed to make a single payment of the entire indebtedness on April 30, 1999—a time deemed sufficient for the Debtor to complete the Renegade contract and obtain payment. To secure the repayment of sums loaned to the Debtor for the comple-

2. Items identified herein as findings of fact may also be construed to be conclusions of law and vice versa. The Court reserves the right to make additional findings and conclusions as necessary or as may be requested by any party.

3. At the preliminary hearing, the Court denied any interim use of the cash collateral pending final hearing on the grounds that no immediate and irreparable harm had been demonstrated as required by Fed.R.Bankr.P. 4001(b)(2).

tion of the Renegade contract, the Debtor granted to CNB a security interest in the specific accounts receivable arising from the Renegade contract.

However, the Debtor's businesses continued to deteriorate through the first quarter of 1999, to the degree that the Debtor decided at some point to abandon the construction business and to concentrate upon his trucking and rodeo supply business. The Debtor is more familiar with the operations of those businesses, according to his testimony at the preliminary hearing, but those operations had suffered financially for a substantial period of time because of the time that the Debtor had to devote to the survival of his construction business.

Because of those losses, when a portion of the Renegade contract proceeds was paid to the Debtor in the approximate amount of $35,000.00 [4], the Debtor did not tender such funds to CNB as required by the promissory note, but rather deposited them in the First National Bank of Linden and, in the pre-petition period, utilized approximately $12,000.00 of the $35,000.00 for operating expenses of his remaining businesses. The remaining amount of approximately $23,000.00 is the amount which the Debtor seeks this Court's authorization to use and for which CNB seeks a prohibition of any such use.

To obtain authority for the use of cash collateral under the Local Rules in this district, a debtor must present a proposed budget which itemizes the proposed use of the cash collateral. Loc.R.Bankr.P. 4001(c)(1)(F). The Debtor's efforts in this regard in this case are woefully lacking and leaves an impression that the financial health of the various business operations of this Debtor is highly suspect. The Debtor's budget, as presented in his schedules, represents that the monthly income of this Debtor is over $13,000 per month. However, that is not demonstrated by the evidence presented to this Court.

First of all, there is no current income from the Debtor's rodeo supply business. Income from that business will not begin until August when the Debtor's livestock is used in three area rodeos. The remainder of any income from the Debtor's rodeo supply business is derived from a host of so-called "school rodeos" conducted during the school year and involving high school rodeo teams. The Debtor admitted under cross-examination that, assuming retention of all current clients, his rodeo supply business, after deduction of only travel expenses, could only result in income of $35,400.00 per year. With the expenses asserted by the Debtor as to the rodeo supply business, such as the feed costs, the annual pasture lease payment, and the annual hay purchase expense, the Debtor, under optimal conditions, would receive net income of less than $1,000 per month from the rodeo supply business.

As to income from the trucking business, the Debtor's evidence is even more sketchy, because he made no effort to correlate for the Court the income and expense figures provided. The Debtor presented an exhibit demonstrating that, from mid-April to mid-May, the Debtor received gross income of just over $7,400.00 and net income of approximately $4,600.00. This "net income" was supposedly derived after the payment of fuel and labor costs, but the Court notes that the Debtor also lists an unpaid May fuel bill of $1,224.00, with no explanation of the difference. So the true net income for that month cannot be accurately determined by the Court.

The Debtor's evidence regarding expenses is more definite. The Debtor presented evidence for April expenses which totaled over $14,000.00.[5] The Debtor also

---

**4.** The Court notes for the record that the sum of $4,000.00 still remains to be collected by the Debtor with regard to the Renegade contract and the Debtor testified that he has not

contacted Renegade about the payment of the remaining amount.

**5.** Though the title on page 5 of Debtor's Exhibit "1" had been altered to allege these

presented evidence as to expenses which have been deferred over the past few weeks or which must be incurred in the coming weeks in the two remaining businesses. Those asserted amounts total almost $24,000.00 and include the following:

(a) payroll taxes for the month of April ($940);

(b) monthly insurance payments of $1300 for the trucks;

(c) the monthly fuel bill for the trucks;

(d) accumulated feed costs for the past 2 months for the livestock ($2400);

(e) an annual expense for the purchase of hay in the amount of $8125;

(f) an annual pasture lease for the livestock in the amount of $1200;

(g) accumulated deferred maintenance on the trucks and/or trailers, particularly as to brakes & tires for the trailers;

(h) the Debtor's personal monthly household expenses of $2274, which includes the Debtor's monthly child support obligations; and, finally,

(i) the Debtor's first Ch 13 plan pymt of $1200.00.

Thus, while the figures cannot be finalized based upon the manner in which the evidence was presented, it is clear to the Court that, as of the present time, this Debtor is losing substantial amounts of money in its operations. The Debtor admitted such upon cross-examination. Part of this may have to do with the seasonality of the Debtor's rodeo business, although the Court must note, even from its own limited knowledge, that the rodeo circuit in this area is obviously active during May, June, and July, not just August, although the Debtor apparently does not supply any animals to any rodeos during those active months.

Notwithstanding such unexplained issues, the Debtor knew or should have known that his trucking operations were losing money on a monthly basis and that there would be a substantial delay before any rodeo income would be produced in August, without a corresponding reduction in "rodeo expenses." In fact, the lease payment and the hay purchase necessitated by the rodeo business were all coming up in the summer, at a time when there would be no rodeo income and little, if any, net income from trucking operations. Yet it was, at that very time, that the Debtor opted to make an interesting, and perhaps an informed, choice.

The only other secured debt of the Debtor, other than the indebtedness to CNB, is to the First National Bank of Jefferson. The Debtor had at some earlier time procured a home equity loan from First National Bank of Jefferson in order to obtain operating capital and, as the end of April, 1999 approached, the Debtor still possessed the sum of $41,373.00 in a deposit account arising from the proceeds of that home equity loan. Of course, the repayment of the home equity loan was, and is, secured by the Debtor's interest in his homestead.

On April 29, 1999, five days before the filing of his voluntary Chapter 13 petition, Mr. Goode, on advice of counsel, tendered the $41,373.24 to the First National Bank of Jefferson, reducing his mortgage indebtedness to that institution, according to his statement of financial affairs, from $59,637.31 to $18,264.07. The Debtor admitted that such a payment was not due, but rather that the mortgage paydown was completely voluntary on his part. Thereafter, the Debtor filed his voluntary Chapter 13 petition on May 4, 1999 and now, following CNB's refusal to agree to the use of the Renegade contract proceeds, the Debtor is before the Court—seeking authority from this Court, over CNB's objection, to use those funds for general operating expenses.

expenses were for the last eight weeks, the expenses were all obviously incurred during the month of April alone.

### III. *CONCLUSIONS OF LAW.*

 Under the provisions of 11 U.S.C. § 1304(b), a Chapter 13 debtor engaged in business [6] may exercise the powers of a trustee under § 363(c) of the Bankruptcy Code to seek authorization to utilize the cash collateral of a creditor. Because actual cash in hand is obviously of great value to a secured creditor, such a debtor is required to segregate and account for any cash collateral in his possession [7] and is further prohibited from using such cash collateral in any manner, unless all secured creditors having an interest in such cash consent to such use or the court authorizes such use over the creditor's objection, after notice and a hearing.[8]

Under the provisions of § 363(e)(2)(B) of the Code, the court may not authorize such use except "as in accordance with the provisions of this section." One such provision is § 363(e), which provides, in part, that when a debtor proposes to use cash collateral, a creditor with an interest in cash collateral can seek to "prohibit or condition such use . . . as is necessary to provide adequate protection of its interest." CNB has made such a demand through the filing of its Motion to Prevent Use of Cash Collateral.

 Thus, it becomes incumbent upon the Debtor in this case to prove by a preponderance of the evidence, as a prerequisite to its use of CNB's cash collateral, that CNB's interests are adequately protected. *See, In re Scottsdale Medical Pavilion*, 159 B.R. 295 (9th Cir. BAP 1993); *In re JKJ Chevrolet, Inc.*, 190 B.R. 542 (Bankr.E.D.Va.1995). Such protection must not be illusory and, particularly in the context of the use of cash collateral, must be "of the most indubitable equivalence." *In re Waste Conversion Technologies, Inc.*, 205 B.R. 1004, 1007 (D.Conn.

1997). Thus, in ruling on debtor's motion for authority to use cash collateral, a court should not focus on "whether or not it is in the best interest of the Debtor and the secured creditor, but whether or not the Debtor carries its burden to show that its use of the cash collateral will not reduce the value of the creditor's interest in the property without providing adequate protection—the indubitable equivalent of the creditor's interest in the property." *In re Glasstream Boats, Inc.*, 110 B.R. 611, 613 (Bankr.M.D.Ga.1990).

 Yet this Debtor concedes that no traditional forms of adequate protection can be provided to CNB for the use of the cash collateral represented by the Renegade contract proceeds. The parties stipulated that there is no equity cushion. The Debtor further admitted that CNB already has a valid and existing lien on all of the Debtor's assets and that no additional or replacement liens can be offered. In a feeble effort to comply with the requirement, the Debtor offers simply that, if he is provided an opportunity to use this singular source of cash, there is "every reason to believe" that the Debtor's business operations will improve.

However, based upon the evidence presented, the Court finds that there is not a single reason to believe that such will be the case. The Debtor offered no cohesive financial evidence regarding his business operations. He conceded that he has no real budget or cash flow expectation by which to gauge the ongoing profitability of his business enterprises. Although feasibility is not directly before the Court on this matter, one could reasonably conclude from the evidence presented that this Debtor may be incapable of funding a chapter 13 plan under which he is required to retain all of CNB's collateral and to pay the value of that secured claim in full.[9]

---

**6.** A Chapter 13 debtor who is self-employed and incurs trade credit in the production of income from such employment is deemed to be engaged in business. 1304(a).

**7.** 11 U.S.C. § 363(c)(4).

**8.** 11 U.S.C. § 363(c)(2).

**9.** As CNB correctly noted in its closing, the Fifth Circuit has recently decided that § 1325(a)(5) precludes a chapter 13 debtor from confirming a plan which proposes to

■ Yet it appears that this Debtor believes that the authorization for use of a creditor's cash collateral can be given solely upon a demonstration that the debtor's need for the use of the cash collateral may be more drastic than that of the creditor and that, absent such authorization, the Debtor may be unable to attempt the confirmation of a chapter 13 plan. While the Court understands that the ramifications of failing to get such authorization can be devastating to a debtor's case, that fact alone simply cannot suffice as the sole means by which to justify the use of a creditor's cash collateral, when the Debtor cannot offer any other means by which to protect that creditor's interest in a meaningful way. *In re McCutchen*, 115 B.R. 126, 133 (Bankr.W.D.Tenn.1990) (in a cash collateral context, mere need does not satisfy the requirements of §§ 361 and 363).

The Court is not unsympathetic to the impact of this decision upon the Debtor. However, this Debtor essentially desires for this Court to impose upon CNB a risk that the Debtor was unwilling to place upon himself. At the end of April, immediately prior to the filing of this case, the Debtor knew that his trucking operations were losing money and that significant repairs needed to be made to his equipment. He further knew that he was approaching a season of the year in which he would have no rodeo income, yet would be facing the substantial portion of his expenses pertaining to his rodeo supply business, including his annual pasture lease payment, his annual hay purchase and, of course, his normal monthly expenses to feed and care for the animals.

Yet, the Debtor thought it a wiser move to reduce his mortgage indebtedness by almost two-thirds, rather than risk his homestead upon the chance that his business operations would improve. The Court will not question the Debtor's evaluation of those risks. However, under the

same analysis, this Court will not impose those risks involuntarily upon CNB, when the Debtor, who knows his business better than any other party, knowledgeably refused to assume them himself.

Cash collateral is a precious commodity and that is a particularly apt description of the Renegade contract proceeds in this case. Because of its value to all parties concerned, the Bankruptcy Code mandates that the authorization of the use of such a commodity can be granted only when the creditor's interest in those funds can be adequately protected in some manner. Because the Debtor is unable to provide such protection, as mandated by the Bankruptcy Code, the Debtor's motion for authority to use cash collateral as to the Renegade contract proceeds must be denied, without prejudice to the presentation of a motion regarding the proceeds of his business operations. CNB's corresponding motion to prevent the use of cash collateral will be granted. A separate order will be entered which is consistent with this opinion.

---

treat a secured claim by returning a selected portion of the secured creditor's collateral while proposing to retain another portion of

such collateral by paying its present value through the plan. *In re Williams,* 168 F.3d 845 (5th Cir.1999).